Estate of Charles J. Ginsberg, Deceased, Burton Ginsberg and Harry Steinberg, Co-executors v. Commissioner. Estate of Charles J. Ginsberg, Deceased, Burton Ginsberg and Harry Steinberg, Co-executors, and Annette Ginsberg v. Commissioner.
Estate of Ginsberg v. Commissioner
Docket Nos. 50034, 50657.
United States Tax Court
T.C. Memo 1958-95; 1958 Tax Ct. Memo LEXIS 134; 17 T.C.M. (CCH) 472; T.C.M. (RIA) 58095; May 26, 1958
Arthur B. Cunningham, Esq., Philip T. Weinstein, Esq., and Daniel L. Ginsberg, Esq., for the Estate of Charles J. Ginsberg, Deceased, and Lawrence G. Ropes, Jr., Esq., for Annette Ginsberg. Roger L. Davis, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in the income tax of the petitioners and additions to tax under section 293(b) of the Internal Revenue Code of 1939 on account of fraud as follows: Addition
Docket No.
Petitioner
Year
Deficiency
to tax
50034
Estate of Charles J. Ginsberg, Deceased
1946
$ 4,146.93
$ 2,073.47
1947
65,227.47
32,613.74
50657
Estate of Charles J. Ginsberg, Deceased,
and Annette Ginsberg
1948
16,576.69
10,118.09
*135 Issues for decision are the correctness of the respondent's action (1) in determining that Charles J. Ginsberg's distributive shares of net income from Nash Miami Motors, a partnership, as reported in his income tax returns for 1946 and 1947 were understated because they did not reflect part of the sales of used automobiles made by the partnership and which the partnership failed to report in its partnership returns of income for its fiscal years ended May 31, 1946, and May 31, 1947; (2) in determining that during 1947 and 1948 Charles J. Ginsberg received from Nash Miami Motors, Inc., income taxable as dividends which he did not report in his income tax returns for those years; (3) in determining that Charles J. Ginsberg's distributive share of net income from Nash Miami Motors as reported in his income tax return for 1947 was understated because it reflected an adjustment to inventory made by the partnership during its fiscal year ended May 31, 1947; (4) in determining that Charles J. Ginsberg's distributive share of net income from Nash Miami Motors as reported in his income tax return for 1947 was understated because it reflected a deduction taken by the partnership in its return *136 of income for its fiscal year ended May 31, 1947, as a loss sustained on the sale of partnership real estate; (5) in determining that an amount of $20,000 paid by Nash Miami Motors, Inc., to Annette Ginsberg in 1948 was taxable as salary for that year; (6) in disallowing deductions taken by Charles J. Ginsberg for 1946 and 1947 for unreimbursed entertainment expenses of Nash Miami Motors and Nash Miami Motors, Inc., respectively; (7) in disallowing a deduction taken by Charles J. Ginsberg for 1947 for a casualty loss; and (8) in determining additions to tax for 1946, 1947 and 1948 under section 293(b) of the Internal Revenue Code of 1939 on account of fraud. Other issues presented by the pleadings which involve the respondent's disallowance of deductions taken by Charles J. Ginsberg for contributions and taxes for 1946, 1947 and 1948 and for medical expenses for 1946 and 1947 have been disposed of by stipulation of the parties. General Findings of Fact Some of the facts have been stipulated and are found accordingly. Charles J. Ginsberg died testate on September 22, 1948. In his will, Charles named his brother, Sydney Ginsberg, as executor. On December 15, 1948, Letters Testamentary *137 were issued by the County Judge's Court in and for Dade County, Florida, appointing Sydney executor of the estate of Charles. Sydney continued to serve as executor until or about April 18, 1957, when he resigned and Burton Ginsberg and Harry Steinberg were appointed co-executors. During 1946, 1947, and 1948, Charles and his wife, Annette, were residents of Miami Beach, Florida. For the years 1946 and 1947, Charles filed individual income tax returns with the collector for the district of Florida. For 1948, Sydney, as executor of the estate of Charles, and Annette filed a joint income tax return with the collector for the district of Florida, entitled "Charles and Annette Ginsberg (Charles deceased 9/22/48)." During 1946, 1947, and 1948, Charles and Annette had the following children who were of the indicated ages in 1957: Name
Age
Stewart
26
Harriet
23
Beverly
21
Harry
A minor
During 1946, 1947, and 1948, Anna Ginsberg was the wife of Sydney Ginsberg and they had the following children who were of the indicated ages in 1957: Name
Age
Daniel
33
Burton
28
From or about 1911 until Charles' death in 1948, he and Sydney were closely *138 associated in business. During that period they engaged in various business ventures or enterprises in which they had equal or approximately equal interests. Prior to going to Miami, Florida, in 1943 or 1944, they conducted operations in Detroit, Michigan. From 1929 until 1938 or 1939, they conducted a partnership business in Detroit in which they sold new automobiles and such used automobiles as they acquired in connection with such sales. Upon terminating the automobile business, they engaged in the building business in Detroit, employing in connection therewith a corporation, in which they were stockholders and which was dissolved prior to or about the time they went to Miami. Their automobile and other operations in Detroit were profitable. At or about the time they went to Miami they opened at the First National Bank in Miami an account designated "C & S Ginsberg," which they used for both personal an business purposes. They continued to maintain the account until the death of Charles. Sydney, in administering the estate of Charles, closed the account and distributed the balance therein one-half to himself and one-half to the estate of Charles. During 1945 and prior to November *139 1 of that year, Charles and Sydney obtained a new car Nash dealership franchise for the city of Miami, Florida. On November 1, 1945, they formed a partnership known as Nash Miami Motors, sometimes hereinafter referred to as Nash Partnership, to operate under the franchise, and the partnership operated under it from that date until February 1, 1947. Charles and Sydney each owned a one-half interest in the partnership. On February 5, 1947, Nash Miami Motors, Inc., sometimes hereinafter referred to as Nash Corporation, was organized under the laws of Florida to succeed Nash Partnership in the operation of the above-mentioned Nash dealership in the city of Miami. Pursuant to an agreement made on or before February 1, 1947, Nash Corporation succeeded Nash Partnership in the operation of the dealership as of February 1, 1947. Nash Corporation continued to operate the dealership throughout the remaining period here in question. From the time of the formation of Nash Corporation until his death, Charles was its president and Sydney was its secretary and treasurer. Following the death of Charles, Sydney became president and his sons, Burton and Daniel, became vice-president and treasurer, *140 and secretary, respectively. Upon organization of Nash Corporation, 20 shares of its stock were issued at $1,000 per share or a total of $20,000. Ten shares were issued to Charles, 9 shares to Sydney and 1 share to Daniel, son of Sydney. The share issued to Daniel represented either a gift from Sydney to Daniel or a purchase by Daniel from Sydney. On or about February 18, 1947, Venetian Realty Corporation, sometimes hereinafter referred to as Venetian Realty, was organized under the laws of Florida. This corporation was organized to, and did, take over real estate which was used in the conduct of the Nash Partnership business and which Nash Corporation after its formation used on a rental basis in its business. Upon organization of Venetian Realty and on February 18, 1947, 10 shares of its stock were issued at $1,000 per share or a total of $10,000. One share each was issued to Charles and Sydney and 4 shares each were issued to their respective wives, Annette and Anna. The foregoing persons continued to hold such shares during the remainder of the period here in question. Shortly after the formation of Venetian Realty and on March 15, 1947, Annette and Anna each withdrew $5,000 *141 from Venetian Realty as a "loan." The amounts were carried on the books of Venetian Realty as accounts receivable until November 29, 1948, in the case of Annette, when she issued a check to Venetian Realty in the amount of $5,000 which was recorded on the books of Venetian Realty as in payment of her account. On the same date she issued another check to Venetian Realty in the amount of $10,000 which was recorded on the books of Venetian Realty as in payment for 10 additional shares of stock in that corporation, which were issued to her on or about that date. On December 10, 1948, Anna paid to Venetian Realty $5,000 which was recorded on its books as in payment of her account. About a month thereafter another $10,000 was paid to Venetian Realty and 10 additional shares of its stock were issued, 5 shares to Burton Ginsberg and 5 shares to Daniel Ginsberg. Issue 1. Understatement of Charles J. Ginsberg's Income From Nash Partnership for 1946 and 1947 Due to Failure To Reflect Part of Sales of Used Automobiles Made by Partnership Issue 2. Understatement of Charles J. Ginsberg's Income From Nash Corporation for 1947 and 1948 Due to Charles' Failure To Report Income Taxable as Dividends
*142 Findings of Fact The Nash Partnership and its successor, Nash Corporation, conducted in Miami, Florida, an automobile sales agency selling new Nash automobiles, used automobiles acquired in connection with the sale of new automobiles, and automobile parts and repairing automobiles. Both Charles and Sydney were active in the conduct of the business of the partnership and of the corporation. Included among their activities was the selling of new and used automobiles. The greater portion of used automobiles sold by the partnership and the corporation during 1946, 1947, and 1948 was sold to dealers in used automobiles and the remaining portion was sold to others including individuals. In the Miami area during 1946 and 1947 the demand for new and used automobiles exceeded the supply. During 1948 the supply was somewhat greater than in the preceding 2 years and the demand was somewhat less. Because of the strong demand for and the limited supply of used automobiles, dealers in new automobiles, including Nash Partnership and Nash Corporation, required dealers in used automobiles to pay high prices for the used automobiles which they sold to them. As a method of providing a basis *143 for recording their automobile sales in their books, Nash Partnership and Nash Corporation prepared typewritten sales invoices for the authmobiles they sold. The amounts shown on the invoices as the selling price of the automobiles were the amounts entered by the partnership and the corporation on their respective books as the selling price of the automobiles sold. The amounts so entered on their books were the only amounts they reported in their respective partnership returns of income and corporation income tax returns as the amounts of their automobile sales. The invoices were prepared in duplicate. The original was prepared as the purchaser's copy and the duplicate was prepared for and was retained in the files of the partnership or the corporation. The sales invoices for used automobiles were prepared by an office employee at the direction of Charles if he had negotiated the sale, or of Sydney if he had negotiated the sale. In directing the preparation of the invoices, Charles and Sydney instructed the employee as to the amount to be entered thereon as the selling price of the automobiles covered by the invoices. Aside from such instructions the employee was without knowledge *144 as to the selling price of the automobiles. The original copies of the invoices which were prepared as the purchaser's copy were not always delivered to the purchaser. In some instances they remained and accumulated in a "customer outgoing box" in the office for such periods that at intervals the employee who had prepared them, after making an inquiry as to the disposition to be made of them, was instructed by an office superior or associate to throw them out. During 1946 through 1948 and prior there-to, R. S. Evans Motors of Miami, Florida, Incorporated, sometimes hereinafter referred to as Evans Motors, was engaged in the business of buying and selling used automobiles in Miami, Florida. Evans Motors was affiliated with or had as subsidiaries 15 to 20 other corporations which conducted business in Florida or other states. Collectively Evans Motors and the other corporations were known as the largest used automobile dealer in the United States. In 1945 Evans Motors employed Robert W. Muir as an automobile salesman and in January 1946 he became its general manager. Thereafter, and about August 1946, he became its president. He continued as its president and general manager until *145 or about the middle of August 1947 when his connection with Evans Motors terminated. A portion of Muir's duties as general manager consisted of buying automobiles. L. P. Evans, who had preceded Muir as president, continued to be connected with Evans Motors after Muir became president and also after Muir ceased to be connected with Evans Motors. While L. P. Evans was president, as well as afterwards, a portion of his duties consisted of buying automobiles. Shortly after Muir became general manager of Evans Motors, he and L. P. Evans, who was then president of Evans Motors, contacted Charles and Sydney to arrange for Evans Motors to purchase from Nash Partnership as many used automobiles as possible. After much conversation about the matter, Charles and Sydney agreed to sell used automobiles to Evans Motors on condition that irrespective of the agreed selling price of the cars to Evans Motors the partnership would invoice the automobiles to Evans Motors at a certain amount, that Evans Motors would issue to the partnership its check for the amount of the invoice, and that if the selling price exceeded the amount of the invoice, such excess would be paid by Evans Motors in cash to Charles *146 or Sydney without disclosure of the cash payment. Charles and Sydney stated that it would be impossible for Evans Motors to purchase used automobiles from the partnership without such cash payments. Since Evans Motors was in need of used automobiles to sell in its business and automobiles were difficult to obtain, the condition imposed by Charles and Sydney was agreed to. Thereafter, and until during August 1948, Nash Partnership and subsequently Nash Corporation, pursuant to the foregoing arrangement, sold used automobiles to Evans Motors. Some of the sales were regularly invoiced by the partnership and the corporation at the agreed selling price, recorded on their books and paid by Evans Motors by check to the partnership or the corporation in the amount of the invoice. In the case of the remainder of the sales, the automobiles were invoiced by the partnership and the corporation at less than the agreed selling price. These sales were recorded on the books of the partnership and the corporation in the amount of the invoices and payment was made by Evans Motors by check to the partnership and the corporation in the amount of the invoices. The remainder of the agreed selling price *147 was paid by Evans Motors in cash. In the case of those automobiles of which Muir had negotiated the purchase by Evans Motors from Nash Partnership and Nash Corporation, and with respect to which cash payments were made by Evans Motors, Muir delivered the cash payments either to Charles or Sydney or to both. In the case of the remainder of the automobiles purchased by Evans Motors from the partnership and the corporation, and with respect to which Evans Motors made cash payments, L. P. Evans, at the request of Charles, delivered such cash payments to Charles. From October 1947 until May 1948, Muir, as sole proprietor, engaged in the business of buying and selling used automobiles in Miami, Florida, under the name of A.A. Auto Sales. He managed the business and during its existence Nash Corporation sold used automobiles to him. With respect to all of such sales, the corporation issued invoices for amounts which were less than the agreed selling price. In payment for the automobiles, checks of A.A. Auto Sales were issued to the corporation for the amount of the invoices. The remainder of the selling price was paid in cash. Muir delivered the cash payments to Charles or to Sydney. *148 Beginning in January 1949 and after Sydney had become president of Nash Corporation, and continuing for about a year, during which time the returns of the corporation and of Nash Partnership were under investigation by the respondent, Muir was employed as sales manager for Nash Corporation. At the time of the trial herein, Muir lived in Hollywood, California. During June and July 1946, Nash Partnership sold some used automobiles to Julius Stern who conducted an automobile rental business in Miami, Florida. For some of the automobiles the partnership issued invoices for the full amount of the agreed selling price. In payment for these stern issued checks to the partnership for the amount of the invoices. For the remainder of the automobiles the partnership issued invoices for less than the agreed selling price. In payment for these automobiles Stern issued checks to the partnership for the amount of the invoices and paid the remainder of the purchase price in cash. Near the end of 1945, Robert E. Gilmore and Don Reed formed a partnership known as Regil Motors to conduct the business of buying and selling used automobiles in Miami, Florida. In December 1946 Nash Partnership sold *149 Regil Motors some used automobiles. Thereafter, beginning in March 1947 and continuing to September 1948, Nash Corporation also sold used automobiles to Regil. All of the sales were negotiated by Gilmore with Charles or with Sydney and usually the negotiations were conducted in the presence of both of them. Payment of the agreed selling price of the automobiles was made by Gilmore to Charles or to Sydney in the form of cash and finance company checks. The finance company checks represented loans which Regil had obtained on cars which it had theretofore acquired. In the case of most purchases, Gilmore, after giving Charles or Sydney the money and finance company checks in payment for the automobiles, waited on the premises until Charles or Sydney returned with the titles for the automobiles. Since Nash Partnership and Nash Corporation were new car dealers, and since Gilmore considered that as such they were fully responsible and "would back up the title to the automobile," it never occurred to him to ask for invoices for the automobiles. However, Gilmore was given invoices for some of the automobiles purchased from the corporation. These invoices were in the amount of the agreed selling *150 price of the automobiles. The selling price of some of the other automobiles sold by the corporation to Regil was correctly recorded on the books of the corporation. The agreed selling price of the remainder of the automobiles sold by the corporation to Regil and of the automobiles sold by the partnership to Regil was recorded on the books of the corporation and the partnership, respectively, at amounts which were less than Regil paid for them. During 1948, C. L. Northcutt bought and sold used automobiles in Miami, Florida. During the period January through November 1948, Nash Corporation sold him used automobiles. All of the purchases were negotiated by Northcutt with either Sydney or Charles but most of them were negotiated with Charles. Payment for each of the automobiles was made in cash and was delivered to the person with whom the sale had been negotiated, that is, Charles or Sydney. In most instances such person delivered to Northcutt title to the automobiles purchased. Although titles to all automobiles purchased were delivered to Northcutt by either Charles or Sydney, he was neither given nor offered an invoice for any of the automobiles. He was not acquainted with business *151 practices and procedures and after receiving titles to the automobiles he left taking the automobiles with him. With a single exception, the selling price of all the automobiles sold to Northcutt was entered by the corporation on its books at amounts which were less than Northcutt paid for them. During the period July through November 1948, Nash Corporation sold used automobiles to P & N Motors, a partnership composed of C. L. Northcutt and a Mr. Pierson which was engaged in selling used automobiles in Miami, Florida. Negotiations for the purchase of these automobiles were made by Northcutt and in the same manner as in the case of the above-mentioned automobiles which he purchased for himself individually. No invoices were received by P & N Motors for the automobiles. The selling price of some of the automobiles was entered by the corporation on its books at the agreed selling price. The selling price of the remainder of the automobiles was entered by the corporation on its books at amounts which were less than P & N Motors paid for them. George Pariso, who formerly had been employed by Evans Motors, was employed by A.A. Auto Sales at the time that business discontinued operations. *152 Upon such discontinuance he decided to purchase some used automobiles for resale for his own account. In May 1948, Nash Corporation sold him some used automobiles. The corporation entered the selling price of the automobiles on its books at amounts which were less than Pariso paid for them. All of Pariso's purchases were negotiated with and all payments therefor were delivered to Charles. During 1948 Nash Corporation sold a used automobile to Edward J. Lennon, who had been in the employ of the corporation during 1947. The corporation entered the selling price of that automobile on its books at an amount which was less than Lennon had paid for it. In addition to the above-mentioned sales of used automobiles, Nash Partnership and Nash Corporation sold used automobiles to various other used automobile dealers and individuals. In its partnership returns of income for the fiscal years November 1, 1945, through May 31, 1946, and June 1, 1945, through May 31, 1947, Nash Partnership included in gross sales as gross sales of used automobiles only the amounts entered on its books from such sales. In his income tax returns for the calendar years 1946 and 1947, Charles Ginsberg reported *153 as income from Nash Partnership only the amounts shown as his distributive share of partnership income on the partnership returns for the fiscal years ended May 31, 1946, and May 31, 1947, respectively. In its corporation income tax returns for the fiscal years February 1, 1947, through November 30, 1947, and December 1, 1947, through November 30, 1948, Nash Corporation included in gross sales as gross sales of used automobiles only the amounts entered on its books from such sales. The return for neither year disclosed any distributions by the corporation to its stockholders of any earnings or profits during the respective fiscal years. The only income reported in Charles Ginsberg's income tax returns for 1947 and 1948 as having been received from Nash Corporation was the sums reported as compensation received from the corporation. In determining the deficiency involved herein for 1946, the respondent determined that in its partnership return of income for the fiscal year ended May 31, 1946, Nash Partnership had failed to report sales of used automobiles in the amount of $12,147.50, that, accordingly, Charles Ginsberg's distributive share of partnership net income shown thereon *154 had been understated by one-half of that amount, or $6,073.75, and that his distributive share of partnership net income as reported in his income tax return for 1946 had been understated by the latter amount. In determining the deficiency for 1947, the respondent determined that in its partnership return of income for the fiscal year ended May 31, 1947, Nash Partnership had failed to report sales of used automobiles in the amount of $59,151.50, that, accordingly, Charles' distributive share of partnership net income shown thereon had been understated by one-half of that amount, or $29,575.75, and that his distributive share of partnership net income as reported in his income tax return for 1947 had been understated by the latter amount. In determining the deficiency for 1947, the respondent also determined that in its corporation income tax return for the fiscal year February 1 through November 30, 1947, Nash Corporation failed to report sales of used automobiles in the amount of $47,825; that such amount had been diverted directly in equal amounts to the benefit of the corporation's two principal stockholders, Charles Ginsberg and Sydney Ginsberg; that, as a consequence, one-half *155 of $47,825, or $23,912.50, constituted income taxable to Charles for 1947 as dividends received from the corporation; and that since the $23,912.50 had not been reported by Charles in his income tax return for 1947, his taxable income for that year had been understated by that amount. In determining the deficiency for 1948, the respondent determined that in its corporation income tax return for the fiscal year ended November 30, 1948, Nash Corporation failed to report sales of used automobiles in the amount of $16,865; that such amount had been diverted directly in equal amounts to the benefit of the corporation's two principal stockholders, Charles and Sydney; that, as a consequence, one-half of $16,865, or $8,432.50, constituted income taxable to Charles for 1948 as dividends received from the corporation; and that since the $8,432.50 had not been reported in the income tax return of Charles for 1948, his taxable income for that year had been understated by that amount. Nash Partnership kept its books and filed its returns of income for the fiscal years November 1, 1945, through May 31, 1946, and June 1, 1946, through May 31, 1947, on an accrual basis. Nash Corporation kept its *156 books and filed its income tax returns for the fiscal years February 1, 1947, through November 30, 1947, and December 1, 1947, through November 30, 1948, on an accrual basis. In its income tax return for the fiscal year ended November 30, 1947, Nash Corporation showed that it had earned surplus and undivided profits of $24,920.19 at the end of the year. In its return for the fiscal year ended November 30, 1948, it showed that it had earned surplus and undivided profits of $74,924.79 at the end of that year. Opinion The parties are in agreement that the petitioners have the burden of proving that the respondent's determination of the deficiencies is erroneous. The petitioners take the over-all position that Nash Partnership and Nash Corporation each had a complete accounting system, that all amounts received from the sales of used automobiles were entered on their respective books, and that the amounts of sales shown in the returns of the partnership and the corporation are in accord with the amounts of sales shown in the books of the partnership and the corporation, respectively; that they have discharged their burden of showing that the respondent's determination that the *157 partnership and the corporation failed to report in their respective returns for the years in question the full amount of their sales of used automobiles; and further that they have overcome the evidence submitted by respondent to the effect that various payments were received in cash from the sale of used automobiles which were not recorded on the books of the partnership and the corporation and were not reflected in the returns of Charles. In support of their contention the petitioners rely on the testimony of Sydney Ginsberg and Helen Myers. Sydney, who was active in the conduct of the business of Nash Partnership and Nash Corporation, including the sale of used automobiles, during the years in question, testified that to his knowledge neither he nor his brother Charles received any sums of money as receipts from the sale of used automobiles of the partnership or the corporation which were not shown as part of the sales in the books and records of the partnership and the corporation. Helen Myers, who was general office clerk for the partnership for a few months during the fall of 1946 and thereafter was assistant bookkeeper for the partnership and subsequently for the corporation *158 until 1951, testified that to her knowledge no money was received in the operation of the business of the partnership and the corporation which was not fully disclosed on the books and records of the partnership and the corporation. In contrast to the foregoing, the record shows that the basis for recording the sales of automobiles on the books of the partnership and the corporation were the sales invoices prepared for the automobiles sold. The record further shows that Charles and Sydney actively negotiated the sales of used automobiles and instructed the employee who prepared the invoices as to the selling prices to be entered therein. Evidence presented by the respondent shows that, in early 1946, Charles and Sydney, as a condition of their agreement for the partnership to sell used automobiles to Evans Motors, demanded, and thereafter personally received, cash payments for automobiles which were in addition to the amounts at which the automobiles were invoiced to and paid for by check by Evans Motors. These cash payments were not recorded on the books and records of Nash Partnership and Nash Corporation. Further, the evidence presented by the respondent shows that in case of *159 sales of used automobiles of the partnership and the corporation to others, Charles and Sydney also received sums of money over and above the selling prices thereof recorded in the books of the partnership and the corporation. As we view the situation, the receipt by Charles and Sydney of sums in excess of the selling prices recorded in the books of the partnership and the corporation was pursuant to a pattern of conduct, formulated by them and thereafter followed by them during the years here involved, and which had for its purpose the concealment of the receipt of such sums from the office help as well as all others who might examine or otherwise be concerned as to what appeared on the books. Concededly, Nash Partnership and Nash Corporation each had a complete accounting system and the amounts of sales shown in their respective returns accord with the amounts shown on their respective books. But that does not aid the petitioners in view of the fact that the full selling price of all used automobiles was not recorded on the books. From a consideration of the evidence bearing on these issues, we are unable to conclude that the respondent's determination that Nash Partnership for *160 the fiscal years ended May 31, 1946, and May 31, 1947, and Nash Corporation for the fiscal years ended November 30, 1947, and November 30, 1948, failed to report sales of used automobiles in the respective amounts determined by him was erroneous. In reaching that conclusion we have carefully considered the various objections made by petitioners to the evidence submitted by the respondent, including the testimony of Robert W. Muir. Concededly, on occasions prior to the trial herein, Muir made certain statements which are not consistent with some of his testimony given at the trial. However, during the trial Muir was on the witness stand for an entire day and part of the following day. During that time we had opportunity to, and did, closely observe his demeanor and in our opinion the testimony he gave herein is credible. Furthermore, his testimony respecting the procedure employed by Charles and Sydney in the conduct of the business of the partnership and the corporation, whereby the partnership and the corporation invoiced used automobiles at amounts less than the agreed selling price and the portion of the selling price in excess of the amount of the invoice was paid in cash to Charles *161 or to Sydney, is corroborated and supported by considerable other evidence of record. Since Charles and Sydney were equal partners in Nash Partnership and were the formulators of and participants in a course of conduct whereby they received sums of money not recorded on the books, we are unable to find that the respondent erred in determining that Charles' distributive share of partnership net income for the fiscal years 1946 and 1947, as reported in his returns for 1946 and 1947, was understated by one-half of the amounts of sales of used automobiles which the respondent determined that the partnership failed to report in its returns for its fiscal years 1946 and 1947. During the fiscal years ended November 30, 1947, and November 30, 1948, Charles, until his death on September 22, 1948, was president of Nash Corporation and Sydney was secretary-treasurer. Following the death of Charles, Sydney became president. Charles owned 50 per cent of the corporation's stock and Sydney owned 45 per cent. As such officers and stockholders they dominated and controlled the corporation and were active in the conduct of its business, including the sale of used automobiles. They received and retained *162 sums in payment for used automobiles which were in excess of the amounts reported by the corporation. There is neither indication in the record nor contention by the petitioners that those sums were expended by them for the benefit of the corporation. Under these circumstances the sums so received and retained constituted taxable dividends to them. Jack M. Chesbro, 21 T.C. 123, affd. 225 Fed. (2d) 674. Since Charles owned 50 per cent of the stock of the corporation, we fail to perceive wherein the respondent erred in determining that one-half of the amounts which he determined the corporation had failed to report as sales of used automobiles for its fiscal years ended November 30, 1947, and November 30, 1948, constituted income taxable to Charles as dividends for the years 1947 and 1948, respectively. Issue 3. Understatement of Charles J. Ginsberg's Income from Nash Partnership Because of Inventory Adjustment Findings of Fact At the time Charles and Sydney received the Nash dealership franchise in 1945, they were informed by the grantor of the franchise that it would ship them a supply of automobile parts. Shortly thereafter, in 1945, the shipment *163 arrived. It consisted of parts for models of 1931 and subsequent years to 1940. On January 31, 1947, the partnership continued to have on hand some of the parts contained in that shipment. As of February 1, 1947, Nash Corporation succeeded Nash Partnership in the operation of the dealership and as of that date acquired the automobile parts and other items of inventory which the partnership then had on hand. No physical inventory of the parts and other items of inventory appears to have been taken either by the partnership or by the corporation. However, the partnership caused a spot check to be made of certain items of inventory. This check disclosed that breakages had occurred in the parts and accessories inventories. From a comparison of the results of the spot check with the book inventories of parts and accessories, paint material, and other small inventories, it was found that shortgages existed as to those items. In addition, it was concluded that some obsolescence had occurred in the parts and accessories inventories. Under date of January 31, 1947, as of which date Nash Partnership closed its books, the partnership's inventory was written down on its books by the amount *164 of $7,229.95 by an entry whereby a debit of that amount was made to the profit and loss account of the partnership, and the following partnership accounts were credited in the indicated amounts: Parts Inventory
$5,129.37
Accessories Inventory
1,440.04
Gas, Oil and Grease Inventory
79.45
Paint Material Inventory
581.09 The entry was explained on the books as follows: "To compute for shortages, breakage, deteriorating, etc. inventory appraised at 60 per cent of value per audit Mr. Rainer." The foregoing entry was made on the books of the partnership by its office manager pursuant to the direction of the partnership's auditor, Rainer. In its returns of income for the fiscal years ended May 31, 1946, and May 31, 1947, the partnership stated that its inventories were valued at the "Lower of Cost or Market." In determining the deficiency for 1947, the respondent determined that the partnership's write-down of its inventory was erroneous and that, as a result thereof, the partnership's net income as reported in its return of income for the fiscal year ended May 31, 1947, was understated by $7,229.95 and that Charles' distributive share of partnership net income *165 as reported in his income tax return for 1947 was understated by one-half of that amount, or $3,614.98. Breakages in the parts and accessories inventories and shortages in the parts, accessories, gas, oil and grease, and paint material inventories amounted to $1,000. Opinion The petitioners contend that the writedown by Nash Partnership of its inventory by the amount of $7,229.95 as set out in our findings represented the actual decrease in the value of such inventory and that respondent's determination with respect there-to was erroneous. The respondent contends that the evidence fails to show that the cost or the market value of the actual inventory of the partnership on January 31, 1947, was less than the amount shown therefor by the partnership's books prior to the write-down. Although a witness for the petitioners testified that it is better accounting practice to take a physical inventory in order to account for shortages, breakage, and deterioration in inventory, Nash Partnership does not appear to have taken such an inventory. Instead, the partnership made a spot check of certain items of inventory. This check discloses that breakage had occurred in the inventories *166 of parts and accessories, the exact extent of which we are not informed. From a comparison of the results of the spot check with the book inventories of parts and accessories, paint material, and other small inventories, it was found that shortages existed as to these items, the exact extent of which is not disclosed. In addition, it was concluded that some obsolescence had occurred in the parts and accessories inventories, the extent of which we are not informed. On the basis of information submitted to him but which has not been disclosed to us and by some method or process employed by him but which has not been disclosed herein, the partnership's auditor, Rainer, concluded that the partnership's inventory would be properly valued by writing down by a composite or over-all rate of 40 per cent, "for shortages, breakage, deteriorating, etc.," the amounts shown on the partnership books as inventories of parts, accessories, gas, oil and grease, and paint material. In support of their position the petitioners rely on evidence submitted by them to the effect that it is a general trade practice by holders of automobile franchises in valuing their inventories to write down by some percentage *167 their inventory of parts, particularly parts for older model automobiles; that, since shortly after it began business, Nash Corporation in valuing its inventories of parts has valued parts for automobiles of current year models at 100 per cent of cost, for models of the preceding year at 80 per cent, for models of 2 years preceding at 60 per cent, for models of 3 years preceding at 50 per cent of cost, and for the balance at zero; and that the corporation's returns for several of the years have been investigated by the respondent and the corporation's method of valuing parts has never been questioned. From the record before us we are unable to determine whether the method attributed to Nash Corporation in valuing its inventory of parts resulted in a correct statement of their value or whether the action attributed to the respondent with respect to such method was proper. Since Nash Partnership reported its income on the basis of inventories valued at cost or market, whichever was lower, the question here is whether the market value of the inventory of automobile parts was less than the amount at which the inventory was carried on the partnership's books. While Sydney testified to *168 the effect that some of the parts contained in the first shipment, which was received in November or December 1945, were on hand on January 31, 1947, which was 13 to 15 months later, and that many of the parts were obsolete on January 31, 1947, there is nothing in the record to indicate that the partnership or anyone else, prior to January 31, 1947, had sold or on January 31, 1947, was offering to sell parts of the type referred to by Sydney at prices which were less than those at which the parts were carried on the partnership's books or that subsequent to January 31, 1947, such parts were sold at lesser prices. Nor is there any evidence that by January 31, 1947, the manufacturer had reduced or proposed a reduction in its prices with respect to the type of parts in questionor that it thereafter reduced its prices. Furthermore, there is nothing in the record to indicate that on January 31, 1947, the parts in question were any less useful for the purpose for which acquired than they were when acquired. In view of the foregoing and in view of the demand for automobiles and particularly used automobiles shown by the record herein to have existed in 1947 in the Miami area, we are unable *169 to find that because of obsolescence the partnership's inventory of automobile parts had a market value less than the amount at which they were carried on its books. We are satisfied from the evidence that breakages had occurred in the parts and accessories inventories and that shortages existed in the inventories of parts, accessories, gas, oil and grease, and paint material and that because of such breakages and shortages some reduction in the amounts at which those inventories were carried on the books of Nash Partnership was essential to a proper determination of the value of such inventories. In the state of the record presented we are unable to determine with exactness the amount of the reduction applicable to the inventories either separately or collectively. Consequently, under the rule of Cohan v. Commissioner, 39 Fed. (2d) 540, we have found as a fact that such breakages and shortages amounted to $1,000. Giving effect to the above-mentioned finding of fact, we hold that Charles' distributive share of the net income of Nash Partnership as reported in his return for 1947 was understated by $3,114.98 because of the inventory adjustment made by the partnership. *170 Issue 4. Understatement of Charles J. Ginsberg's Income for 1947 From Nash Partnership Because of Partnership's Deduction Taken as a Loss From Sale of Real Estate Findings of Fact During November 1945, Nash Partnership acquired at a cost of $35,002.70 certain land, comprising 5 lots, adjacent to the Venetian Causeway in Miami, Florida. During the latter part of 1945 and the early part of 1946, the partnership, at a cost of $160,043.38, constructed a building on the land for use as an automobile showroom and as a garage. Thereafter, the building was used for such purposes by the partnership and subsequently by Nash Corporation. Some portion of the cost of the building resulted from the difficulty encountered in obtaining steel products at normal prices. Errors in steel fabrication and in construction also cause the cost of the building to be in excess of that which normally would have been expected. Prices for steel for building and construction purposes declined to an undisclosed extent from or about 1947 to 1949. By a mortgage instrument, dated October 14, 1946, executed by Charles, joined by Annette, and Sydney, joined by Anna, the land and building were encumbered by *171 a mortgage in favor of the Mutual Life Insurance Company of New York in the face amount of $100,000. The mortgage was recorded on October 25, 1946. The first principal payment on the mortgage was due in the sum of $2,500 on January 1, 1947, with the balance due in the amount of $2,500 quarterly, annually thereafter. By an entry on its books, dated January 31, 1947, Nash Partnership wrote down the total cost of the land and building by $65,046.08, or from $195,046.08 to $130,000. Of the $65,046.08, an amount of $63,449.10 was debited to the partnership's profit and loss account and the remainder, $1,596.98, was debited to the reserve for depreciation account for the building. The journal explanation for the foregoing action was as follows: "To record loss on building due to increase of labor and material at time of building it. See appraisal figure by Lon Worth Crowe." The "appraisal figure" referred to was stated in a letter to Charles and Sydney from Crow, dated February 27, 1947, which contained the following: "Referring to your inquiry as to the Stabilized Value on your property at 545 N.E. 15th Street, Miami, Florida, known as the Nash Miami Motors, which you own and are *172 now occupying, it is my opinion that the property has, as of today, a Stabilized Value of $130,000.00." The term "Stabilized Value" as used by Crow was a composite of various different kinds of value, including fair market value, loan value, sale value, and leasing value of the land and building. Crow's letter was not the form of an appraisal that he regularly submitted when requested to make an appraisal of property. By warranty deed, dated January 31, 1947, and recorded May 1, 1947, the land and building were deeded by Sydney, joined by Anna, and Charles, joined by Annette, all as grantors, to Venetian Realty. The land and building were entered on the books of Venetian Realty at a cost of $130,000 and the consideration shown therefor was the assumption by Venetian of the outstanding mortgage on the property of the then amount of $97,500 and the issuance by Venetian of notes payable to Nash Partnership in the amount of $32,500. The entries showing the foregoing were made at the direction of Charles at whose direction other entries subsequently were made in the books of Venetian. Payment of one-half of the notes, $16,250, was made by Venetian to Sydney during the period February 15, 1949, through *173 December 4, 1950. Payment of the other half of the notes was made to the estate of Charles during the same period. The land and building constituted the only asset of Venetian Realty when it began operations, except $10,000. The latter was paid in for capital stock and the entire amount thereof was disbursed in equal sums to Annette and Anna within 4 weeks after the organization of Venetian and was recorded on Venetian's books as accounts receivable. The amounts so disbursed were not returned to Venetian until more than 2 months after the death of Charles. Venetian received monthly payments of $2,500 from Nash Corporation which were recorded on its books as rental income. Its only financial. activities throughout the period involved herein were to receive the foregoing payments, make property and other tax payments, and service the mortgage outstanding on the property. Anna was president of Venetian and Annette was secretarytreasurer. Annette's duties were to write checks. She and Anna each received from Venetian a salary of $500 a month. Although on its books Nash Partnership debited its profit and loss account with $63,449.10 of the $65,046.08 by which it had written down the *174 cost of the land and building on account of what was considered to be a loss due to excess construction costs, in its partnership return of income for the fiscal period ended May 31, 1947, it reported in Schedule B. - Gains and Losses From Sales or Exchanges of Property Other Than Capital Assets, a loss of $63,449.10 resulting from the sale of the land and building. The cost of the property was shown as $195,046.08, the gross sales price as $130,000, and depreciation allowed or allowable since acquisition as $1,596.98. The loss so reported by Nash Partnership was taken as a deduction on its return in computing its ordinary net income and the distributive shares of partnership net income. In determining the deficiency for 1947, the respondent disallowed the deduction and accordingly determined that Charles' distributive share of partnership net income as reported on his income tax return for 1947 was understated by one-half of the $63,449.10, or $31,724.55. Opinion Taking the position that in a bona fide transaction during its fiscal year ended May 31, 1947, and on January 31, 1947, Nash Partnership, in which Charles and Sydney each owned a one-half interest, conveyed the land *175 and building which had cost the partnership $195,046.08 to Venetian Realty, the stock of which was owned 1 share each by Charles and Sydney and 4 shares each by Annette and Anna, for $130,000, the then fair market value of the land and building, the petitioners contend that the respondent erred in denying the deduction of $63,449.10 taken by the partnership as a loss sustained on the sale of the property. Taking the position that the conveyance of the property to Venetian Realty was not pursuant to an arm's length transaction and that the petitioners have not established that $130,000 represented the true fair market value of the property, respondent contends that the petitioners have not shown that the partnership sustain any loss and, further, if any loss had been sustained, the provisions of section 24(b) of the Code would prohibit the allowance of it. In Campana Corporation v. Commissioner, 114 Fed. (2d) 400, it was said: "A sale at arm's length connotes a sale between parties with adverse economic interests." In Howard A. Jackson, 24 T.C. 1, affd. 233 Fed. (2d) 289, it was said: "The test to determine whether a transaction is a bona *176 fide transaction is described by the term 'arm's length,' or, in other words, was the transaction carried out in the way that the ordinary parties to a business transaction would deal with each other?" As we understand the position of the petitioners, they do not contend that the land on which the building was constructed had any less value in January 1947 than its cost of $35,002.70. Accordingly, any question as to value of the property must relate to the building. With Charles and Sydney having successfully engaged in the construction business and also in the automobile business before coming to Florida, it is difficult for us to conclude that they would expend more than $160,000 in the erection of a building for use in the conduct of their automobile business which approximately 1 year later had a value of less than $95,000, or that they would have sold to a stranger for $130,000 the land and building which had cost them in excess of $195,000 and which they expected would be used by Nash Corporation in the conduct of the automobile business. Crow's appraisal of the land and building at a "Stabilized Value" of $130,000 on February 27, 1947, when considered in the light of his testimony *177 that his concept of "Stabilized Value" represented a composite of various different kinds of value, including fair market value, loan value, sale value, and leasing value, no one of which was given for either the land or the building, affords little aid to the petitioners here. Further, the deed to the property to Venetian was dated January 31, 1947, which was approximately 4 weeks prior to the time Crow made his appraisal. Further, we are not informed as to what negotiations, if any, were conducted with Venetian Realty or who participated in the negotiations respecting the sale of the land and building to Venetian for $130,000. Anna and Annette, who were the officers of Venetian, are not shown to have had at that time business experience of any kind or to have been consulted as to the price at which Venetian would acquire the property. Although shown to have been nominally a minority stockholder and not shown to have been an officer or employee of Venetian, Charles is shown to have directed that an entry be made in Venetian's books recording the acquisition of the land and building at a cost of $130,000 as well as to have directed the making of subsequent entries in Venetian's *178 books. Following the conveyance, Nash Corporation occupied the premises at a monthly rental of $2,500, or $30,000 a year. The record fails to show how or by whom that rental was fixed. Since Charles and Sydney were officers of Nash Corporation and had not only successfully engaged in the construction business but had successfully conducted an automobile business before coming to Florida, it is difficult for us to conclude that in an arm's-length transaction they would have agreed for Nash Corporation to pay a rental of $30,000 a year for property which had a value of only $130,000. In this connection we think it significant that while a portion of the recited consideration for the conveyance of the land and building to Venetian Realty was a payment to Nash Partnership of $32,500 and upon organization of Venetian it had $10,000 which had been paid in for its capital stock, no portion of that amount was used to make payment of the $32,500 but that notes were issued by Venetian therefor and that within 4 weeks after the organization of Venetian, the entire $10,000, which consisted not only of such amounts as Annette and Anna paid in for stock but also of the amounts Charles and Sydney *179 paid in for stock, was disbursed in equal amounts to Annette and Anna as accounts receivable and not returned to Venetian until more than 2 months after the death of Charles and that the portion then returned by Annette originated with Nash Corporation. Annette and Anna are not shown to have engaged in any business nor does the record show what disposition they made of the sums disbursed to them by Venetian. Since Charles and Sydney each owned a one-half interest in Nash Partnership and since each of them and his wife owned one-half of the stock in Venetian Realty, we are of the opinion that, under the circumstances presented, the conveyance of the land and building to Venetian Realty was not an arm's-length transaction. Further, from the record before us, we cannot find that $130,000 correctly reflected the fair market value of the property at the time conveyed to Venetian and that Nash Partnership sustained a loss of $63,449.10 or any other amount as a result of the conveyance. Accordingly, the respondent's determination as to this issue is sustained. During the trial a witness for the petitioners stated that Nash Partnership did not take any deduction in its partnership return *180 of income for the fiscal year ended May 31, 1947, for depreciation on the building conveyed to Venetian Realty for the period June 1, 1946, through January 31, 1947. The petition raised no question respecting depreciation on the building and no amendment to the petition has been filed by petitioners presenting the question. Consequently, as the pleadings stand, no issue is presented as to that question. However, petitioners on brief contend that in the event it is held that the deduction of $63,449.10, heretofore considered, was not allowable, then it should be held that the partnership was entitled to a deduction of $2,333.94 for depreciation on the building, representing depreciation computed at an annual rate of 2 1/2 per cent upon the cost of the building, $160,043.38. In John Gerber Co., 44 B.T.A. 26, it was said: "It is well established that issues not raised by the pleadings will be disregarded and not considered." Accordingly, we make no determination respecting the foregoing contention of the petitioners. Issue 5. Payment of $20,000 by Nash Corporation to Annette Ginsberg Findings of Fact The funeral of Charles Ginsberg who died on September 22, 1948, was *181 held in Detroit, Michigan. Following the funeral, his widow, Annette, remained in Detroit for several weeks before returning to her home in Florida. After her return to her home, she was told by some undisclosed person that she "was going to get" $20,000 from Nash Corporation. On November 17, 1948, the directors of Nash Corporation, consisting of Sydney Ginsberg, president, Burton Ginsberg, vicepresident and treasurer, and Daniel Ginsberg, secretary, held a special meeting. The minutes of that meeting contain the following: "RESOLVED that the total compensation for services rendered for the fiscal year ending November 30, 1948 be set at $35,600.00 for Sydney Ginsberg; the balance due Sydney Ginsberg is payable to him after January 31, 1949. "Mr. Sydney Ginsberg stated that Charles Ginsberg had planned and sacrificed much of his time and energy to achieve the success of the business, and that he had always handled and taken care of the administrative part of the business. Unfortunately, he died before realizing to any substantial extent upon the products of his efforts and interests, and that while there is no obligation upon the company to express its appreciation in monetary *182 terms, it was in his opinion just and proper that gratuity in the amount of $20,000.00 for the year 1948 and $10,000.00 for the year 1949, be made to his widow, Mrs. Annette Ginsberg, in recognition of services he performed and results he accomplished for the company. Accordingly, the following resolution was adopted: "Be it resolved that there be paid by the Nash Miami Motors, Inc., to Annette Ginsberg, the widow of Charles Ginsberg, as a gratuity for the fiscal year ending November 30, 1948, the sum of $20,000.00 and for the fiscal year ending November 30, 1949, the sum of $10,000.00." Thereafter, Nash Corporation issued a check, dated November 30, 1948, made payable to Annette in the amount of $20,000. Sydney delivered the check to Annette on November 26, 1948, and told her that it was issued to her as a gratuity. She was very much surprised to receive a check. However, since at the time of his death Charles owned 10 shares or one-half of the stock in the corporation, Annette after his death felt that she and her children had a half interest in the corporation. In the administration of Charles' estate, Annette elected to take dower instead of taking under the will and there *183 were distributed to her 3 1/3 shares of the stock in the corporation which Charles owned at the time of his death. Annette was never employed by nor performed any services for Nash Corporation in consideration of which the corporation paid her the $20,000. On November 26, 1948, the day that Sydney delivered the check to her, Annette deposited it in her account at The Miami Beach First National Bank, Miami Beach, Florida. On November 29, 1948, Annette drew two checks on that account payable to Venetian Realty, one for $5,000 and the other for $10,000. On the same day these checks were deposited in the bank account of Venetian Realty. The check for $5,000 represented a return to Venetian Realty of a disbursement in that amount made by Venetian to her on March 15, 1947, and the check for $10,000 was in payment for 10 additional shares of stock in that corporation, which were issued to her on November 29, 1948. In its corporation income tax return for the fiscal year February 1, 1947, through November 30, 1947, Nash Corporation deducted $64,600 as compensation of officers. One-half of that amount, or $32,300, was shown as Charles' compensation as president and a like amount was shown *184 as Sydney's compensation as secretary-treasurer. In its corporation income tax return for the fiscal year December 1, 1947, through November 30, 1948, the corporation deducted $48,550 as compensation of officers. Of that amount, $12,600 was shown as Charles' compensation as president, $35,600 as Sydney's compensation as "Secy. Pres.," and $350 as Burton Ginsberg's compensation as vice-president and treasurer. No part of the $20,000 paid by Nash Corporation to Annette was reported as income in the joint income tax return for 1948 for Charles and her and filed by her and Sydney as executor of the estate of Charles. In determining the deficiency for 1948, the respondent determined that the $20,000 represented salary and included the amount in the income reported in the joint income tax return filed by Annette and Sydney for that year. Opinion Taking the position that the evidence establishes that the $20,000 paid by Nash Corporation to Annette was not compensation for services rendered to the corporation by either Charles or Annette but was a gift made by the corporation to Annette and relying on the decisions in Louise K. Aprill, 13 T.C. 707, Alice M. MacFarlane, 19 T.C. 9, *185 Estate of Arthur W. Hellstrom, 24 T.C. 916, and Estate of John A. Maycann, Sr., 29 T.C. 81, among others, the petitioners contend that the respondent's inclusion of the $20,000 in the income reported in the joint return of Charles and Annette was erroneous. Although conceding that the evidence establishes that Annette was never employed by, nor performed any services for, Nash Corporation in consideration of the payment, the respondent contends that the evidence fails to show that the payment was not made as compensation for services rendered by Charles. Whether a corporate payment is a gift or something else presents a question of fact to be determined in each case. Bogardus v. Commissioner, 302 U.S. 34; Lengsfield v. Commissioner, 241 Fed. (2d) 508. The fact that a corporate resolution authorizing a payment designates the payment as a gratuity is not determinative of the character of the payment. Thomas v. Commissioner, 135 Fed. (2d) 378; Lengsfield v. Commissioner, supra. The above-cited cases relied on by petitioners involved payments made by corporations to the widows of deceased officers of the *186 corporations and in all instances the payments were held to be gifts. The evidence in those cases clearly showed the terms and conditions of the employment of the deceased officers respecting their compensation, both prior to and at the time of their death. Further, the evidence showed that the payments did not represent unpaid compensation of the officers and that, under the terms and conditions of the employment of the officers, the corporations were not required after the death of the officers to make such payments to their widows. Although the record here shows that Charles was employed as an officer of Nash Corporation from the time of its formation in February 1947 until his death in September 1948, it fails to show the terms and conditions of his employment respecting his compensation. It is true the corporation's income tax returns for the fiscal years February 1, 1947, through November 30, 1947, and December 1, 1947, through November 30, 1948, show deductions of $32,300 and $12,600 taken as Charles' compensation for the respective years, or a total of $44,900 for the 2 years. It is also true that in his income tax returns for 1947 and 1948 there was reported as compensation *187 received by him from the corporation a total of $45,500. Withholding statements, Forms W-2, prepared by the corporation and copies of which were attached to Charles' returns show total compensation of $45,500 paid to him by the corporation during 1947 and during 1948 until his death in that year. In its corporation income tax return for the fiscal year ended November 30, 1947, which was for a 10-month period, Nash Corporation took deductions in equal amounts, $32,300, as compensation for Charles and Sydney. In its return for the fiscal year ended November 30, 1948, which was for a 12-month period, the corporation deducted $35,600 as compensation to Sydney and deducted $12,600 as compensation to Charles. Although it is true that Charles died on September 22, 1948, or 8 days prior to the end of the first 10 months of that fiscal year, the record contains no explanation as to why Sydney should receive $23,000 more than Charles as a result of his having rendered services for 2 months and 8 days longer than Charles. On a monthly basis, the deduction taken as compensation for Sydney for the fiscal year ended November 30, 1948, appears to have been $333.33 less per month than for the fiscal *188 year ended November 30, 1947. A like reduction would not account for the fact that the deduction taken for Charles' compensation for 1948 for almost a 10-month period was $19,700 less than for 1947 for a 10-month period. Recognizing the absence of evidence explaining the foregoing disparities, the petitioners state on brief that "In actual fact Charles' last illness kept him away from the business much of the time in 1948." If the foregoing statement, even though it is not evidence, be accepted as petitioners' explanation of the disparities, we think it falls short of establishing why for the fiscal year 1948 Charles' compensation was only about 35 per cent of Sydney's for that year and only about 39 per cent of Charles' compensation for the fiscal year 1947. The minutes of the special meeting of the directors of Nash Corporation on November 17, 1948, at which the resolution authorizing payment to Annette of the $20,000 in question was adopted, show that the resolution was based on statements recited in the minutes as having been made by Sydney at the meeting. Among such statements was the one that there was no obligation upon the corporation to express in monetary terms its appreciation *189 for the sacrifice of the time and energy made by Charles in promoting the success of the business and in taking care of the administrative part of the business and with respect to which he did not, before his death, realize to any substantial extent upon the products of his efforts and interests. Although Sydney appeared as a witness for the petitioners and testified as to a number of other matters, he gave no testimony as to matters relating to the directors' action in authorizing payment of $20,000 to Annette. Nor have the petitioners favored us with any testimony from the other directors, sons of Sydney, about the matter. As the record stands, we are without information as to the factual basis upon which Sydney rested the conclusion embodied in his statement that there was no obligation upon the corporation to express in monetary terms its appreciation for Charles' sacrifice of time and energy. Since the record does not disclose the terms and conditions of Charles' employment relating to compensation, and does not otherwise show that the corporation theretofore already had discharged all of its obligations to him under the terms and conditions of his employment, it may well be that *190 the $20,000 payment to Annette was pursuant to and in discharge of the corporation's obligation to make compensation for Charles' services. The petitioners did not submit any testimony as to how Nash Corporation recorded on its books and treated in its income tax return for its fiscal year 1948 the payment of $20,000 to Annette. However, attached to the income tax return of Charles and Annette for 1948, which was executed by her and by Sydney as executor of Charles' estate, is a copy of a withholding statement, Form W-2, prepared by the corporation which shows payment to Annette of $20,000 as "Total wages (before payroll deductions) paid in 1948." The statement shows that no Federal income tax was withheld as to the payment. If the payment of $20,000 to Annette, which according to the minutes of the meeting of the board of directors of the corporation on November 17, 1948, was authorized at the instance of Sydney, was in fact what the minutes recited it to be, namely, a gratuity, it is not apparent from the record why the corporation, of which Sydney was president, thereafter designated the payment as wages, and Sydney, as executor of Charles' estate, joined in filing an income tax *191 return for Charles to which was attached a representation that the payment was wages. In view of what has been said above, we are unable to sustain the contention of the petitioners that the payment to Annette was a gratuity. From the record before us we think the payment may well have been compensation for services rendered by Charles to the corporation. Accordingly, we sustain the respondent as to this issue. Issue 6. Charles J. Ginsberg's Unreimbursed Entertainment Expenses of Nash Partnership and Nash Corporation. Findings of Fact During calendar years 1946 and 1947, Charles entertained various persons in his home on an average of about once or twice a month. Some of the persons so entertained on an undisclosed number of occasions were officials of Nash-Kelvinator Corporation, the grantor of the dealership franchise to Charles and Sydney, and some were otherwise connected with that corporation. Others so entertained on an undisclosed number of occasions were persons engaged in the automobile business in Detroit or in Atlanta. When officials of Nash-Kelvinator were entertained, the cost of the dinner was about $125 to $150. On an undisclosed number of occasions Charles *192 rented a fishing boat and took some persons (whether officials of or otherwise connected with Nash-Kelvinator or whether not connected with that corporation is not disclosed) on fishing trips at undisclosed costs. The cost of the dinners was paid in the first instance by Charles. In his income tax returns for 1946 and 1947, Charles deducted $1,963.85 and $1,500, respectively, for unreimbursed expenses. In determining the deficiencies for those years, the respondent disallowed the deductions. Opinion The petitioners contend that the record discloses that during 1946 and 1947 Charles entertained officials of Nash-Kelvinator Corporation for the purpose of favorably impressing them so that they would allocate as many automobiles as possible to Nash Partnership and Nash Corporation. Petitioners further contend that the record affords a basis for a finding that the cost of such entertainment, aside from the cost of fishing trips, was approximately $1,500 a year and that Charles was not reimbursed by either Nash Partnership or Nash Corporation for the outlays he made in providing such entertainment. Although there is no testimony directed to the matter, we have no doubt from the record *193 as a whole that any entertainment of officials of Nash-Kelvinator by Charles was for the purpose of impressing them and of influencing them to make generous allocations of automobiles to the partnership and the corporation. However, the record is not so clear as to the amounts expended by Charles for such entertainment and his failure to have been reimbursed therefor by the partnership or the corporation. No records appear to have been kept by either Charles or his wife or anyone else as to his expenditures for entertainment during the calendar years 1946 and 1947, the years here involved. In its partnership return of income for the fiscal year ended May 31, 1946, which was for a period of 7 months, Nash Partnership deducted $2,305.23 for travel and entertainment, and in its return for the fiscal year ended May 31, 1947, during which it operated the automobile business for 8 months, it deducted $2,992.70 for travel and entertainment. In its corporation income tax return for the fiscal year ended November 30, 1947, which was for a period of 10 months, Nash Corporation deducted $2,770.10 for travel and entertainment, and in its return for the fiscal year ended November 30, 1948, it *194 deducted $6,366.71 for travel and entertainment. Neither the returns nor the record otherwise shows the portion of the foregoing amounts that was for travel or was for entertainment. Sydney testified that during the calendar years 1946 and 1947 both he and Charles incurred expenses for entertainment for the benefit of Nash Partnership and Nash Corporation for which they were not reimbursed by either the partnership or the corporation. He estimated that he and Charles expended about equal amounts and that his expenditures for such entertainment "could have been $1,200" or "could have been $2,500" a year. On the basis of his testimony it would appear that he and Charles were spending from $2,400 to $5,000 a year for entertainment on behalf of the partnership and the corporation for which they were not reimbursed. If as much as one-half of the amounts deducted by the partnership and the corporation for entertainment and travel be regarded as having been taken for entertainment, it would appear that Charles and Sydney were expending for entertainment on behalf of the partnership and the corporation and for which they were not reimbursed amounts considerably in excess of the amounts deducted *195 by the partnership and the corporation for such purpose. If such sums were expended by Charles and Sydney as the testimony of the latter indicates, it is not apparent why they were not reimbursed therefor, particularly, since they were the only members of the partnership and were the officers of and controlled the corporation. The testimony of Sydney contains no explanation of his and Charles' failure to obtain reimbursement nor does the record otherwise contain such an explanation. In such a state of the record we think as plausible a conclusion as any is that the sums testified to by Sydney were not made for entertainment for the benefit of the partnership or the corporation and that for such reason reimbursement therefor was neither obtained nor sought from them. So far as we are able to determine from the record the partnership and the corporation have deducted and have been allowed all sums expended by them or by others for entertainment in their behalf. Accordingly, the respondent's disallowance of the deductions involved in this issue is sustained. Issue 7. Deduction Taken by Charles J. Ginsberg for a Casualty Loss Findings of Fact During 1947, and until the latter part *196 of that year, Charles resided at 4701 Alton Road, Miami Beach, Florida. A lower porch of the house in which he resided was screened with individual screens and, for a top, had a large canopy-like awning. The canopy and the screening were damaged to an undisclosed extent by a hurricane that occurred in 1947. The damage was repaired at an undisclosed cost. In his income tax return for 1947, Charles deducted $400 for a casualty loss, which was explained as "Damage by hurricane and flood." In determining the deficiency, the respondent disallowed the deduction for lack of substantiation. Opinion The petitioners contend that they have discharged their burden of showing that the deduction taken was properly allowable. They further contend that in the event the evidence is considered insufficient to sustain the amount deducted we should find some other amount to be deductible, relying on an unreported decision of this Court. Section 23(e) of the 1939 Code provides for the allowance of deductions in the case of individuals of losses sustained during the taxable year and not compensated for by insurance or otherwise of property not connected with the trade or business, if the loss arises *197 from storms or other casualty. While it is clear from the record that the damage involved here arose from a storm, the record fails to show that Charles was not compensated for such damage by insurance or otherwise. Since the Code provides for the allowance of only such losses as are not compensated for and the record herein fails to show that the damage here involved was not compensated for, we are without basis for sustaining the contentions of the petitioners. The allowances made in the case relied on by petitioners were with respect to storm damage which we found had been sustained, but with respect to which we further found that the taxpayer had not been compensated. Consequently, that case is without application here. Issue 8. Additions to Tax Under Section 293(b) of the Code. Findings of Fact In its partnership returns of income for the fiscal years ended May 31, 1946, and May 31, 1947, which were sworn to by Charles, Nash Partnership reported gross receipts of $183,285.71 and $590,910.43, respectively, and net incomes of $17,990.16 and $2,524.59, respectively. One-half of the amounts of net income reported for the respective years, or $8,995.08 and $1,262.30, was shown *198 as Charles' distributive share of the partnership net income for the respective years. In his income tax returns for 1946 and 1947, the only amounts Charles reported as income from the partnership were those respective amounts. In its income tax return for the fiscal year ended November 30, 1947, which was sworn to by Charles as president and Sydney as treasurer, and in its income tax return for the fiscal year ended November 30, 1948, which was sworn to only by Sydney as president, Nash Corporation reported gross sales of $841,161.16 and $1,142,778.09, respectively, and net incomes of $37,064.23 and $80,650.49, respectively. By their conduct in receiving and retaining from the sale of used automobiles of the partnership and the corporation substantial sums of money in excess of the amounts recorded on the books of the partnership and the corporation, Charles and Sydney not only caused the sales and net income of the partnership and the corporation to be substantially understated on their respective books, but caused the sales and net income of the partnership and the corporation to be substantially understated in their respective returns. As a result of his and Sydney's conduct, *199 Charles received substantial sums properly reportable in his returns for 1946 and 1947 as his distributive share of the net income of Nash Partnership for such years and received substantial sums properly reportable in his returns for 1947 and 1948 as income from Nash Corporation. None of such sums was reported in any of his returns for those years. As a result of the omission of such sums, part of the deficiency for each of the years 1946, 1947, and 1948 was due to fraud with intent to evade tax. Opinion The parties are agreed that the respondent has the burden of proving fraud. The respondent has sustained that burden by clear and convincing evidence. He has shown that Charles and Sydney deliberately arranged to have the books of Nash Partnership and Nash Corporation contain false entries which would understate the true selling price of used automobiles; that they caused the partnership and the corporation to file returns in which such true selling price was understated; that they received and retained substantial sums from the sale of used automobiles of the partnership and the corporation which were not shown on the books of or in the returns of the partnership and the corporation; *200 and that by such receipt and retention, Charles received from the partnership and the corporation substantial sums which were reportable by him but which were not reported in his income tax returns for the years in question. Accordingly, we have found that as a result of the omission of such sums part of the deficiency for each of the years was due to fraud with intent to evade tax. In their petitions the petitioners assigned as error the failure of the respondent to determine that the period of limitations had expired for the assessment of tax for each of the years 1946, 1947, and 1948. In his answer the respondent denied that his action was erroneous. At the trial the parties submitted in evidence by stipulation consents in writing executed by Sydney, as executor of the estate of Charles, and the respondent extending the period for assessment of tax for the years 1946 and 1947 to a date subsequent to the sending of the notice of deficiency for those years, and a consent in writing executed by Sydney, as executor of the estate of Charles, and Annette and respondent extending the period for assessment of tax for the year 1948 to a date subsequent to the sending of the notice of deficiency *201 for that year. In this situation and since the petitioners neither at the trial nor on brief have made any contention with respect to the issue, we assume that they have abandoned the issue and hold for the respondent as to it. Decisions will be entered under Rule 50.